And we just have one case on the calendar this afternoon and see everybody's ready. I'm not going to call the calendar. We're ready to proceed. Good afternoon. May it please the court. With the time allotted, I'm going to address the Third Amendment complaints dismissal with prejudice based on futility. And regarding the jurisdictional bar arguments, what AIG has asserted are public disclosures, we contend do not remotely constitute public disclosures and we will submit on the briefs. So the rest of the time, I'm just going to address the Third Amendment complaint sufficiency. Before I get to it, AIG in its papers states that we've had a history of failed attempts to cure deficiencies and that we've had serial pleadings. That's just not true. We amended in 2011, the First Amendment complaint, added the theory before the court, the cause of action before the court. That was the First Amendment and that was done when the case was under seal and AIG didn't know about it. So it wasn't based on any challenge and we could have just filed a new complaint, but we just added it as the First Amendment complaint. Would you just get to the main issues? Yes. So we understand that. Okay, you do, okay. But there are three basic arguments relating to the sufficiency, so why don't you? Right. So the false statements, start with the false statements. The theory is that AIG got a multi-billion dollar reduction in the debt reduction agreements by making false representations and warranties. Specifically, it falsely represented and warranted that ALICO and AIA had all the licensing they were supposed to have, when in fact they were, through GMD, AIG unit, were illegally selling insurance in New York. That's the false statement. The district court said it was the underlying fraud of not marketing or selling insurance. It's the reps and warranties. Well, you can go ahead. The question to me is materiality because I never thought in my whole life I'd be sitting anywhere and asking seriously whether $100 million is material. But that is a question here because it was the difference between $24.4 billion and $24.3 billion, and the question was under these circumstances, is that a material difference? Your Honor, we believe we've sufficiently applied materiality, and I'll address that. But let me just say we've never had an opportunity to replete on materiality based on any AIG challenge. The first time they raised it was in opposition for leave to file the Third Amendment complaint. We've never had an opportunity to replete based on an AIG challenge. That's the original pleading that we have. Okay. That being said, having no opportunity to replete, we pled that GMD revenue constituted a major part of ALICO revenue. Major part. We pled that in the complaint. If it's a major part of the revenue, one has to infer that if the reps and warranties were properly disclosed that ALICO was selling insurance without a license, that would depress the valuation and therefore depress the debt reduction that AIG got. But why is that the framework within which to see materiality in the context of this case? I mean, in this case, the issue is that you've got the Federal Reserve Bank of New York, really the Federal Reserve Board, making an assessment about whether it is worth doing or engaging in these two transactions, whether it's worth $24.4 billion ultimately. Right? Right. And that is all in the context of an effort to avert the financial collapse of the financial system. Right. Why isn't that the appropriate framework? I understand what you're trying to do is atomize it so that it's a much narrower framework. Well, the financial crisis had passed by now. The execution of the debt reduction agreement by AIG was in June of 2009, and it was closed in December of 2009 where the reps and warranties were reiterated as true. Do you agree that the reason that the Federal Reserve Bank of New York was engaged in this enterprise was to stabilize the financial markets? Absolutely. And all we're saying— At that point? Yes. And all we're saying is that the government overpaid the reduction of debt. They just overpaid. It's like they bought Staples, and the Staples were $2 more than they should have been, and they overpaid. The government did get the equity interest of $9 billion for Alico and $16 billion for AIA. The government got that. It just overpaid. And you say that the amount of the overpayment, who you allege, the complaint alleges, that the amount of the overpayment was at least $100 million, but that's arguably up to $600 million, I take it. Your Honor, we—again, if we're just with the pleadings, we pled that GMD was a major part of Alico revenue. Now, I can submit in good faith a proffer as to what we would— Sure, but do you—so when you say—well, go ahead. I could submit in good faith a proffer of what we would add to materiality since we've never had a repleting based on a challenge with leave of the court. But when you say—when you ask us to look at the one allegation about how GMD was a major source of revenue or a major component, that's not the thrust of the allegations in the complaint. The allegations in the complaint are that the total amount of the risk, the liability, and so on was at least $100 million. The total amount of undervaluation was—or overvaluation was at least $100 million if you include the liabilities. What we pled was that the valuation and the debt reduction were—the agreement was it would be equivalent with the government. The way we pled it was that the $600 million simply in the 10-K disclosures, and we said we got it from the 10-K disclosures, accounted for some kind of reserve that we didn't understand what it meant. But the $600 million in alternate pleading, as we argued, in the light most favorable to the plaintiff, should be assessed all against AIA or all against ALICO but not both to preclude the pleading. And also $100 million, the way we pled it, in the light most favorable to the plaintiff should be more than that. Why shouldn't it? And I do want to, if we leave the court, make the proffer. So what you say is, well, we say at least $100 million. It could be anything above that. You could have pled it's at least $10, and it could be anything above that. And that doesn't really help us assess the materiality. Well, it could be that we don't ever get an opportunity to replead materiality based on a challenge. We've never had an opportunity, and it could be we never get one. But I would like to just— Could you address the knowledge of the false statement as well? I mean, because materiality is one issue, but I'm not sure it's the only one you face here. So the knowledge issue and this False Claims Act allows us to successfully plead knowledge based on constructive knowledge. It doesn't have to just be actual knowledge. But we've pled actual knowledge with Rodney Martin, who was president of ALICO. We pled extensively how he was knowingly part of the group that would conceal GMD employees in different companies for which they did no work, didn't sell any insurance for them, like American General, in order to conceal that from regulators. Now, what's his knowledge of the debt reduction agreement? He's president of ALICO. It's 100 percent of ALICO's interest being transferred. Moreover, any reasonable due diligence, which the court must presume some kind of due diligence for a $25 billion transaction, means that he would have either known, had actual knowledge, or it's deliberate ignorance of truth or falsity under the False Claims Act, constructive knowledge, because you just don't ignore that in a $25 billion agreement, that there's widespread illegal sales of insurance by ALICO. You just don't ignore it if the president knows it. And furthermore, we pled that there was a deceptive response to a regulatory opinion to the New York regulators in between the execution and the closing of the debt reduction agreement from June to December. That's when they made the representation. Mr. Martin was involved in that. We pled that an AIG officer was present at the meeting with Mr. Kermit Brooks, superintendent, where they represented, and we pled this, ALICO does not sell insurance in New York. And based on the significance of this regulatory letter, that it was done pursuant to this overall transaction, debt reduction agreement, because they're trying to package ALICO with the GMD because it was a substantial part of the revenue. So if they're doing that and they ask for a regulatory letter, one may infer, along with the other evidence we have, we pled on Rod Martin, that he knew, and or other officers knew. And finally, after the fact, after the closing of the debt reduction, AIG tried to lobby a change in the statute. And the change in the statute, AIG, its agents stated, this is paragraph 159, under current law an entity cannot act on behalf of an unauthorized insurer from offices in the state, even if the actions include solicitation, negotiation, or underwriting of risks that do not involve New York residents. That's plain knowledge that what they're doing is illegal, not to mention the ordinary reading of the statute, proposing to make or make an insurance policy to New York residents or corporations authorized to do business in New York requires a license. There are no less than five regulatory opinions published since 1999 by the Department of Insurance that state if you sell to a New York resident or corporation authorized to do business in New York for out-of-state risks, you need a license. It was emphatically clear AIG knew it needed a license, and that regulatory letter removed any doubt when they got the response to the regulatory letter in late 2009, before the final closing of the execution of the debt reduction agreement. You have an allegation as to why they would not get a license. It doesn't sound like an overwhelming barrier to go up and get a license. Is there anything in what you've alleged or what you know that suggests why they wouldn't do that if they thought they were supposed to? As far as why they didn't get a license, I think that, first of all, if they got a license, Alaco was susceptible to losing incredible regulatory benefits in terms of tax and reserving that it received in Delaware. So Delaware, it had a special exemption where it could do administrative functions, and in return it wouldn't have to pay any taxes and premiums, wouldn't have to pay corporate income tax and so forth. If AIG sought to get Alaco and AIA approved, all of a sudden they lose the regulatory exemption, and AIA has all these regulatory obligations. Lose the Delaware? Right. And in the memo we cited in our pleading, they talk about losing the Delaware exemption, that this is a risk and we might lose it, and certainly that's a motive. Also, I want to point out with the knowledge that we've pled, the knowledge part, we've also pled motive and opportunity, which was completely disregarded by the district court and AIG's pleadings. Knowledge and opportunity alone can establish knowledge. We pled it, and we successfully pled it in terms of AIG, to your point, AIG had an overwhelming motive to make false representations and warranties in order to receive that debt reduction. I mean, AIG simply would have gotten, and we would proffer, I would like to do the proffer, would leave it to the court, $1.45 billion would have been the difference that we didn't plead. That's what AIG would have gotten because, and we didn't plead this either, and it's not in the record, but GMD was 13% of the profits of Alico and AIA. And if given that one chance to replead, which we've never had, based on a challenge, we would replead that. That's far more than the $600 million. And I don't think that's chump change to the government or the taxpayers, because this is taxpayer money. That's certainly enough. And the fact that AIG in its papers tries to argue that after the fact, months later, AIG was paid with interest is contrary to New York law that damages must be measured at the time the fraud is committed, and similar to contract, things may change later in the future. And the fact of the matter is the transactions where the government was paid could have gone south later, months later. But that's a subsequent event that shouldn't be counted. And it's all through there. You're asking us to conclude or infer that the full 13% of profits associated with GMD was an exposure to the government as a result of these transactions? I'm sorry, Your Honor, I don't understand. You're asking us, so you tell us. You started this way by telling us that GMD was a significant component of the profits of ALECO and AIA. And in connection with going back to the materiality argument here, and in connection with that, you say, well, the exposure associated with GMD was material. Is that correct? Yes. All right. But that would mean that the ‑‑ but I think you're also asking us to infer from these allegations and from what you just said that the total amount of exposure for the government was, and really I guess for AIG, was the full 13% of profits. All I'm saying is, and this is the argument, is that the valuations, and we pled this, were done by the income method, which assumes future profits based on historical revenue. Well, you can't count on illegal insurance sales as part of future revenue had the reps and warranties been truthful. So if you're going to properly disclose that, that's going to depress the price. It's not the exposure to the government. The government would have sought other ways to get its money from AIG. I mean, it's not exposure to the government. It's just they overpaid for the debt. As soon as they bought a car that was over, that cost too much, and AIG got much more in debt reduction than it should have. And it did it by fraud, by making false representations and warranties. We'll hear from you unless we have other questions. Unless you'd like to use your rebuttal time now, we'll hear from you afterwards. Thank you. Thanks. Good afternoon. May it please the Court. William Burke for the appellee AIG. Just to start, I believe what we just heard from my opponent was the sixth attempt to amend the complaint in this case. The very first, and I won't spend too much time on the history, but the very first complaint under seal was in May of 2010. When that was then first amended complaint in July 2011, that added, that complaint added the allegation that GMD was engaged in insurance business in New York that should have received a license or should have been authorized by a license. AIG first received and was served a complaint in 2014. At that point, all of the initial allegations filed in 2010 were gone. They'd been abandoned. And the only thing that now remains is this question of the insurance status, the licensing status of GMD. What I'd like to do with the Court's permission is focus on the issues that you raised and try to address them. Just before you do that, on the question of materiality, your adversary says today that he has never had, his client has never had an opportunity to replead in light of your attack on his allegations, his present allegations. Is that right? No, Your Honor. The appellant or the relator before the district court has had many opportunities and every time has to plead materiality and has every time failed to do so. When we were in front of Judge Daniels, it was a Third Amendment complaint, and in fact what happened in that proceeding was, and the reason why it was a challenge effectively to the Third Amendment complaint, was because he was trying to now file a new Fourth Amendment complaint because he realized, based on the motion to dismiss that we had filed with respect to the Third Amendment complaint, that he couldn't survive it. So now he was trying again. So the judge turned it into a proceeding about whether or not he should be allowed to file a new medical complaint. And there was an entire colloquy, if I recall, between Judge Daniels and the relator's counsel about materiality for pages and pages. Pages and pages. Your Honor, I think the oral argument in front of Judge Daniels was about four hours long, probably equally split, maybe more, toward the relator. It took me longer to read it. Well, Your Honor, and everyone was speaking very quickly, I guess. The relator had a very extensive discussion of materiality. The idea that he has not had an opportunity to plead it over the course of the last seven years is just not justified in the record. And as to materiality, the point that Your Honors have made, the question about, well, why did the U.S. government engage in this transaction, the debt reduction agreement, the self-evident actually stated purpose was to rescue AIG because of the potential consequences that a failure would have to the markets around the world. Just as the Court has noted. The very specific amount or value of AIA and Alico combined was $24.4 billion. That was the agreement. The debt reduction that was agreed was $25 billion. So the U.S. government was already building in an assumption that there would be a $600 million loss to the U.S. government based on this deal. And, of course, the reason for that is because they were trying to save trillions of dollars, not a few hundred million or a hundred million. I'll get to the hundred million in a second. But also I think it's important that AIG paid back everything that was loaned by the U.S. government with a premium. So to the extent that factors in the materiality, I think it's notable that AIG did pay everything back plus some. Now, the $100 million to us is a bit of a red herring or more than a bit of a red herring because the way that that number is calculated is by taking settlement agreements from consent decrees that were entered into with New York State regulators and saying that MetLife paid $60 million for a settlement relating to Alico with the New York State regulators. AIG paid $35 million to settle a lawsuit that we brought against the Department of Financial Services. And then adding those together, that's 95, so let's say roughly $100 million. To us, there's no logic or coherence to that theory as to why that is even a measure. We still have no basis to understand after all these years what the measure or what the damage is. Well, I think that the idea is that the relator doesn't have access to all this information and it's forward-looking, but it's in the context of potential liability. So tax liability, loss of business associated with the inability to continue to engage in this alleged insurance business in New York, and so on. So why isn't it reasonable to infer based on the allegations that are in that third amended complaint that it could be well in excess of $100 million of lost business, lost opportunities, and so on? Your Honor, I think that you've put it much better than the relator ever has and has ever had any opportunity to, or has had every opportunity to do so and has never articulated a theory as to what the damage is. Now, the damage could be, as you said, various tax issues, other issues. That has never really been alleged in any kind of other than just sort of saying, well, that could have happened. Now, our view is that there was no violation of New York state law, and that's one of the reasons why we brought a lawsuit and they settled it. You settled with that. We settled with that, and the consent decree, of course, we did. And there's never been an adjudication one way or the other about what the law means on that issue of whether or not GMD could engage in these activities. But beyond that, and this is the point, I think, going to materiality and the $100 million, GMD, when the representations and warranties that were made were about Alico and AIA. They were about Alico and AIA. They had nothing to do with GMD. GMD was a division of AIG, and the purpose of GMD was to provide certain marketing activities, marketing services to certain subsidiaries of AIG. The representation warranty that was made in the debt reduction agreement was that Alico and AIA have all the licenses they need to conduct their business. I'm sorry, but just again, one reasonable way to look at the third amended complaint and the allegations that are contained in that complaint is that GMD was being used as a subterfuge. It was being used by AIG and really by Alico and AIA to do what Alico and AIA couldn't otherwise do. That is, engage in an insurance business and solicit insurance business in New York. I hear what you're saying, but I think that what the appellant has actually alleged is not that. What the appellant is alleging is that GMD was essentially an alter ego of some sort of Alico and AIA, and that what GMD was doing has to be attributed to Alico and AIA. So therefore, when a statement was made that Alico and AIA had their licenses, that means that GMD had its license. That is what their argument is, and that's been their argument consistently. Or that means that AIA and Alico were doing business, an insurance business in New York, but using GMD to pursue that business. I think that we can quibble about it, but there's a fair inference that that's from the allegations. Your Honor, I think that that is an inference with a lot of a very, very intelligent way to look at what they're trying to say, but that's not what they've said. And also we would say that if you look at the actual elements here, falsity, materiality, and knowledge, that they fail on each of those grounds. And again, on falsity, I don't want to harp on this. I know this is not an issue that the Court has really been interested in, but I think it's very important to realize that even if we now, or the Court does not agree with the reading that AIG had and Alico had of the law for 50 years, because this was going on for decades, the activities that were at issue with GMD, the point is that there is zero evidence, and there's been no allegation of any sort, that AIG was knowingly and falsely saying, we are going to follow a different interpretation of the law than is otherwise required. Everything shows that there was a good faith belief that AIG believed that this law, they were complying with this law, that GMD was complying with this law. And it's very important that all the issues that my colleague mentioned in terms of the opinion that came out referencing GMD's activities, they all happened after the debt reduction agreement was agreed to, after the representations and warranties were made. There's not a single piece of fact, allegation that he has put forward that suggests that anybody at the time that this was made thought that GMD was knowingly violating New York law. And of course, I know this is not definitive, but I think it's useful to look at the context of what AIG did after this became an issue and sought relief in federal court under constitutional and statutory interpretation of the law to try to prevent the Department of Financial Services from taking a view that we thought was inaccurate. What about the allegations about Rodney Martin and his going to establish both? You could say they go to both, knowledge and falsity, his conduct and his position, his involvement, suggesting that he knew that the allegations were false, or the position was false with regard to GMD. We believe that my opponent calls it constructive knowledge. We think this is actually collective knowledge theory, which is disfavored. There is absolutely no allegation whatsoever that Rodney Martin had anything to do with the negotiation of the debt reduction agreement. There's zero allegation of that. Except by reference to the fact that he was the executive vice president of AIG and the CEO of, I don't know which one, but one of these subsidiaries. That's right. That was his position. But I think there are two points on that. One is that he alleges that Rodney Martin knew that there was a problem with the licensing. But putting that aside, it's an allegation. We think it's vague, but putting that aside, he had nothing to do. There were people at AIG who were responsible for negotiating with the U.S. government. And by the way, of course, the U.S. government just selected the assets along with AIG that they wanted, they thought were valuable, to come up with this deal. Rodney Martin had nothing to do with that, and he doesn't allege the contrary. He simply says that because he says that Rodney Martin would have known or should have known about this issue, that therefore it should be attributed to AIG and to the very people who were negotiating the debt reduction agreement. That, we submit, does not follow in logic or in fact. And without that connection, we're left with a mismatch, where on the one hand he's alleging, again, we don't think it's accurate and we certainly don't think he's done it properly, that there was knowledge at Alaco that there was a problem with GMD's status as an unlicensed entity. And on the other hand, that AIG, which was negotiating the deal with the U.S. government, somehow knew this problem from Alaco. There's literally nothing in the allegations in any of the various of the complaint that link those two up other than to say it must have been the case. And that's not sufficient under any standard. So our view is that knowledge, on the knowledge point, there is no allegation that anybody who was actually involved in negotiating this deal had any knowledge, not even knowledge of the problem with licensing, had any awareness of the licensing issue as being an issue. Then you have the falsity. And again, our view is that the law is clear that if we had a bad faith belief, we were false, we were misleading about what we really thought, that would be one thing. Here there's no allegation that we were acting in bad faith, that we were putting forward a theory of the statute that we didn't actually believe. Anything, it's quite the opposite. And all the things that the relator points to as suggesting that there was some knowledge after the fact happens after the debt reduction agreement. Of course, the AIG was investigated by the DFS. That's no secret. There was this opinion that we disagree with the way it's been characterized. But all this stuff happens afterwards. And as any company would do, once there are suggestions that maybe you've done something inappropriate, you would deal with it. You'd start looking at it. The suggestion that AIG was involved in trying to lobby the statute, to change the statute. Again, this all happened after the debt reduction agreement. Of course, once DFS comes and says we think that GMD may have been doing things it shouldn't have done, any responsible company is going to take notice of that. My time is up, so I will stop here unless you have further questions. Thank you very much. Thank you. For the court to accept that Rodney Martin knew nothing about the debt reduction agreements, the court would have to accept that when we pled that he was on the AIG divestiture committee charged with selling off AIG assets to pay back the TARP debt and was a member of the committee, the Alaco Separation Executive Steering Committee for the Acquisition by Alaco of Delam, that was intended to conceal these GMD personnel and package it with Alaco as part of this entire transaction, that he would have to be, and plus he's president of Alaco, and he would have to be ignorant of the debt reduction agreement. That's just not an inference that I think should be made in our pleading. Do we have a witness who was there watching things as they were happening? The standard is plausibility, and I think we've met plausibility with simply Rodney Martin, but we've also met it with the motive and opportunity and with the other allegations. I want to put out the opinion letter that Mr. Burke says was only done after the execution of the debt reduction agreement. We pled that the debt reduction agreement representations and warranties were recertified and re-signed as true and correct six months after the initial execution. That was the closing. Well, the regulatory opinion came out in between, so that removed any scintilla of doubt by AIG that Alaco and AIA could not sell insurance through GMD without a license. That removed any doubt, and it wasn't just after the execution. It was before the closing. As far as good faith belief of complying with the law, we pled ad nauseam from paragraph 104 to 148. So many instances where AIG knew that GMD was unlawfully selling insurance on behalf of Alaco and AIA by shuffling employees, hiding them in American General, hiding them elsewhere, talking about it all the time, trying to figure out. It's just not an inference in the light most favorable to the plaintiff that can be made. We pled both ways. We pled that GMD, that Alaco and AIA were selling insurance through GMD. We pled that. And we pled it the other way, that GMD was de facto Alaco and AIA because all of its revenue went to Alaco and AIA. We pled that. And all of its costs were paid by Alaco and AIA. And they were selling Alaco and AIA products. Well, what are they? Just it's all an accident that their revenue is going to Alaco and AIA and their costs are paid? Is that an accident? Well, we also pled that, in fact, Alaco and AIA were selling on their behalf. And regarding the we've never been able to repled based on the challenge of materiality, I'm sure has more than enough to figure that one out, but we just haven't. What was it that I read? So that colloquy that went on and on and on about materiality between, was it you? No, it was a colleague of mine. Someone else. I mean, there were proffers that were made in real time to Judge Daniels about what more we would proffer from materiality if the judge found it to be insufficient. And, yes, we made a proffer in court. That's correct. He had the benefit of that proffer. He understood the issue. Well, you might claim he didn't understand fully the issues of materiality, but he certainly understood that that was an issue and what you might provide. And he denied it on grounds of futility. Right. And it's just we would just submit that we if a proffer in court in oral argument rises to the level of a motion to amend in terms of the presence of mind, having all the facts and so on and so forth, then the court can read it as a as one attempt to replete materiality. But with the benefit of sitting in one's office for a week and looking it over and thinking about it, we have more that we can plead, including the fact that GMD was 13 percent of these two entities, 8.4 percent of Alaco's profits and 4.6 percent of AIA's profits. You may not have made or I can't recall if you provided those specific figures to Judge Daniels, but you certainly made the general argument that GMD was a significant or not insignificant component of the business for AIA and Alaco. Right. We pled that. We pled that GMD was a major part. The word was major in our pleading of Alaco income, and we just we would fix it if it deemed to be insufficient. We have the benefit of that allegation and the transcript to chew on. Right.  Thank you. Thank you both. Well argued. Thank you for coming in this afternoon, and I'll ask the court be adjourned. Court is adjourned.